**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **DANIEL C. BRIGGS,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BOAT/U.S., INC., and SOCIETY OF ACCREDITED MARINE SURVEYORS, INC.,**<br><br>**Defendants.** | **Civil Action No. 12-11795-DJC** |

# MEMORANDUM AND ORDER

**CASPER, J.** November 20, 2012

## I. Introduction

Plaintiff Daniel C. Briggs ("Briggs") brings an action against co-defendants Boat/U.S., Inc. ("Boat/U.S.") and Society of Accredited Marine Surveyors, Inc. ("SAMS") arising from events that allegedly occurred relating to SAMS suspending and then terminating Briggs as a member of its organization. Briggs now seeks a temporary restraining order and a preliminary injunction against SAMS seeking, among other relief, reinstatement to SAMS. For the reasons stated below, the Court DENIES the motion for injunctive relief.

## II. Factual Allegations and Procedural History

Briggs is a marine surveyor based in Mattapoisett, Massachusetts. Am. Compl., D. 6 ¶¶ 3, 5. SAMS is a non-profit Florida corporation that describes itself as a "professional organization that offers accreditations for the marine survey profession." D. 6 ¶¶ 18-19; SAMS'

Answer, D. 19 ¶ 18-19. Boat/U.S. is a Virginia corporation and national boating club that also sells marine insurance to boaters. D. 6 ¶¶ 15-16; Boat/U.S.' Answer, D. 17 ¶¶ 15-16.

Prior to June 27, 2012, Briggs had been an accredited marine surveyor and a member of SAMS. D. 6 ¶ 9; D. 19 ¶ 9; Aff. of Joseph B. Lobley, D. 23 ex 2 at 72. In 2005, an individual named Ronald Hirschberg ("Hirschberg") hired Briggs to perform an insurance survey of Hirschberg's sailboat, "Changes in Latitude." D. 6 ¶ 28. In April 2012, Hirschberg contacted Briggs to arrange a new insurance survey so that Hirschberg could switch insurance carriers to Boat/U.S.. D. 6 ¶ 29. Briggs alleges that he gave a draft survey to Hirschberg "with very little information changed from the 2005 survey," for the limited purpose of Hirschberg's being able to "show[] his insurance agent that the survey was underway, not completed." D. 6 ¶¶ 36-41. Briggs further alleges that Hirschberg submitted this survey to Boat/U.S. on April 19, 2012, but that Hirschberg did not tell Boat/U.S. that the survey was a "draft, preliminary survey." D. 6 ¶¶ 36-41.

Boat/U.S. rejected the survey and Bruce Spahr ("Spahr") of Boat/U.S. called SAMS President Joseph B. Lobley ("Lobley") on April 27, 2012 to complain about Briggs' preparation of the survey. D. 6 ¶¶ 52, 55; D. 17 ¶¶ 52, 55; D. 23 ¶ 20; D. 23 ex. 2 at 27. This complaint, later memorialized in writing, started a process wherein Briggs' SAMS membership was suspended and then terminated, and his SAMS accreditation was revoked on June 27, 2012. D. 23 ex. 2 at 72.

On September 17, 2012, Briggs filed a complaint and ex parte motion for a temporary restraining order in Plymouth Superior Court in Massachusetts seeking, inter alia, an order to reinstate Briggs as a member of SAMS. D. 26 at 1, 73-75. On September 27, 2012, the case was removed by SAMS to this Court before the state court motion had been resolved. Id. at 1-2.

Before this Court, the plaintiff has filed this motion for a preliminary injunction and temporary restraining order and an amended complaint. D. 5-6.

In his motion for preliminary injunction against SAMS, Briggs seeks an order from this Court that SAMS "immediately reinstate Mr. Briggs as a member of SAMS® in good standing, retroactive to the date of his suspension, with all of the rights and privileges he enjoyed prior to such time" and that SAMS "write and send to Mr. Briggs, with a copy to remain in SAMS® administrative file, a letter stating, in substance, that the prior decisions suspending and terminating Mr. Briggs were unfair, were taken without due consideration of the relevant facts, and that such suspension and termination should be deemed a mistake, and null and void from the time they occurred." D. 5 at 2. On October 26, 2012, the Court held a hearing on the motion and took the matter as against SAMS under advisement.[1]

**III. Standard for Preliminary Injunction and Burden of Proof**

In deciding whether to grant a preliminary injunction, the Court must evaluate "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest." González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009) (quoting Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 11 (1st Cir. 2008)). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the

[1] In his motion, Briggs also sought a preliminary injunction against Boat/U.S., asking that the Court (a) order Boat/U.S. to "resume accepting marine surveys" from Briggs, (b) write a letter to Briggs and SAMS that its prior complaint concerning Briggs was in error, was withdrawn, and that "Briggs' work, to Boat/U.S.'s knowledge, has always been exemplary and of high quality" and (c) to place Briggs on its list of marine surveyors that it "approves" or to whom it refers potential or current customers. D. 5 at 2. After a hearing on October 26, 2012, the Court denied the motion for a preliminary injunction against BOAT/U.S. for reasons stated on the record. D. 39.

plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)).

## IV. Discussion

### A. Addressing Briggs' Likelihood of Success on the Merits

Briggs focused his likelihood of success on his due process claim and not on his other claims against SAMS. Accordingly, the Court confines its analysis to this claim.

#### *1. SAMS Policies for Suspending & Terminating Its Members*

Because SAMS is a not-for-profit corporation incorporated in Florida, it is subject to Florida law. "It is a well established proposition in Florida law that ordinarily Courts will not intervene in the internal affairs of . . . voluntary associations." Rewolinski v. Fisher, 444 So. 2d 54, 58 (Fla. Dist. Ct. App. 1984). There are limited exceptions for such interventions. Id. In McCune v. Wilson, 237 So. 2d 169, 173 (1970), the Supreme Court of Florida held that "a private organization . . . may not expel or discipline a member adversely affecting substantial property, contract or other economic rights, except as a result of fair proceedings which may be provided for in organization by-laws, carried forward in an atmosphere of good faith and fair play"; see Fla. Stat. Ann. § 617.0607 (West 2012) (providing that "[a] member of a [non-profit] corporation may not be expelled or suspended, and a membership in the corporation may not be terminated or suspended, except pursuant to a procedure that is fair and reasonable and is carried out in good faith"); see also Fine Mortuary Coll. v. Am. Bd. of Funeral Serv. Educ., Inc., 473 F. Supp. 2d 153, 158 (D. Mass. 2006) (noting the existence of common law due process even in the absence of a state statute). Accordingly, such intervention is only warranted if "(1) the association's action adversely affects 'substantial property, contract or other economic rights' and the association's own internal procedures were inadequate or unfair, or if (2) the association

acted maliciously or in bad faith." Rewolinski, 444 So. 2d at 58 (discussing McCune). That is, courts only intervene "to ensure that a fair proceeding is held." Horner v. Homestead S. Dade Bd. of Realtors, Inc., 405 So. 2d 492, 494 (Fla. Dist. Ct. App. 1981) (affirming denial of intervention where although Board failed to provide notice and hearing as required by contract, the final order of suspension afforded plaintiff all rights under the association's by-laws).

In his due process claim against SAMS, Am. Compl., D. 6 ¶¶ 89-104, Briggs alleges that judicial intervention is warranted both because SAMS' suspension and later termination of Briggs affected substantial property or economic rights (an allegation that SAMS does not appear to dispute for the purposes of this motion) and the association's own internal procedures in effecting the disciplinary action were inadequate and unfair and that SAMS (and its Board) acted with bad faith. As part of these allegations, Briggs claims that SAMS failed to follow its own policies and procedures in effecting his suspension and termination. SAMS disputes this allegation. Although Briggs has made out a plausible due process claim against SAMS, this Court cannot conclude on this record that he has a likelihood of success on his claim that SAMS suspended and terminated him in violation of his rights to due process and fair procedure.

The Court begins with SAMS' policies and procedures regarding suspension and termination. A SAMS "member may be subject to suspension of membership for . . . a formal written complaint of violation of SAMS® Code of Ethics and Rules of Practice, filed with the International Office, investigated as prescribed in the 'Termination Policy' and affirmed by a two-thirds (2/3) vote of the Board of Directors . . . ."[2] But, if as here, the matter "is deemed to be of a very serious nature" then the President may "recommend" a temporary immediate suspension of a member to the Executive Committee, and the "Executive Committee may, by

[2] All quotations in this section are taken verbatim from D. 23 ex. 3 pp. 1-2 (SAMS' "Policy" regarding "Suspension of Members") and D. 23 ex. 4 pp. 1-2 (SAMS' "Policy" regarding "Termination of Members").

unanimous vote, direct a temporary immediate suspension of the member pending a report by the Investigation Committee and subsequent review by the Board of Directors." The suspension policy states that the "investigative procedure described in the 'Termination Policy' shall apply to the investigation requirement under this 'Suspension Policy.'"

"A [SAMS] member may be subject to termination of membership [because of] a formal written complaint of violation of SAMS® Code of Ethics and Rules of Practice, filed with the International Office." The procedures for terminating a member includes: (1) a formal written complaint be filed with supporting documentation; (2) the SAMS president may "direct the Ethics Committee Chairman (Executive VP) to appoint an Investigation Committee of two (2) AMS® members to conduct an investigation of the complaint"; (3) the Investigation Committee "shall have thirty (30) days to review information, conduct an investigation, and make recommendations to the Ethics Committee Chairman and the President"; (4) the member may request a formal hearing at the next scheduled Board of Directors meeting; (5) the member is to receive a copy of the Investigative Committee's reports; (6) the member at the hearing shall not be represented by a lawyer, may have an advisor, and may present up to three witnesses; and (7) the member shall have the right to question any witness. Any termination must be confirmed by a two-thirds vote of the Board of Directors. SAMS alleges that it "followed all of its internal procedures," in suspending and terminating Briggs. D. 22 at 5.

*2. SAMS' Initial Decision to Suspend Briggs*

SAMS' action against Briggs originated when Bruce Spahr ("Spahr") of Boat/U.S. contacted SAMS President Joseph B. Lobley ("Lobley") on April 27, 2012 with a complaint regarding Briggs about the survey submitted by Hirschberg. D. 23 ¶ 20. Given the very serious nature of the complaint, on April 30, Lobley sent the SAMS Board of Directors a "Polled Vote

Request" that indicated that Briggs had "violated 1A, 3A, 4A, 4B and 5D of SAMS® Code of Ethics and Rules of Practice by knowingly providing a fraudulent survey." D. 23 ex. 2 at 28. It further noted that "[t]he request for immediate suspension is based on verbal testimony and written and recorded evidence from Mr. Bruce Spahr of BoatUS. Mr. Briggs allegedly submitted a written survey, and then later admitted in a voice mail that he did not actually perform a full survey the [sic] vessel. It is perceived that his intentions were to assist the boat owner in obtaining insurance from BoatUS." Id. Finally, it indicated that "the complaint will be fully investigated and presented to the Board of Directors at the June 13, 2012 meeting." Id.

The Board unanimously approved the suspension. D. 23 ex. 2 at 29. Briggs objects that the suspension and full Board vote occurred before an investigation was conducted. Although SAMS suspension policy contemplates that for matters of "a very serious nature," the Executive Committee of the Board can recommend immediate suspension pending a report by the Investigation Committee, the fact that this action was approved by the full Board and not solely the Executive Committee gave Briggs more process not less. Briggs also objects that SAMS' actions were precipitated by a verbal, rather than written complaint, by Boat/U.S.. The record is conflicted about whether Spahr's complaint constituted "a formal written complaint" as contemplated by the SAMS suspension policy. D. 23 ex. 3 at 1. There is no dispute that Spahr made his initial complaint verbally. SAMS indicates that Spahr later memorialized this complaint is writing. Lobley Aff. D. 23 at ¶ 22. The April 30 vote request makes reference to "verbal testimony and written and recorded evidence" from Spahr, but any such written complaint appears to have come after the vote request was sent to the Board.[3] D. 23 ¶¶ 21-23; D. 23 ex. 2 at 30. On May 4, Lobley sent a letter to Briggs that referenced the complaint filed by

[3] SAMS cites an "email" from Spahr dated "4/31/12" (not a calendar date) that attaches the survey at issue. D. 23 ¶ 22; D. 23 ex. 2 at 33.

Boat/U.S, enclosed a copy of the Suspension Policy and informed Briggs that he had the "right to appeal the suspension at the next SAMS® Board of Directors Meeting that will be held on June 13, 2012 in Baltimore, Maryland." D. 23 ex. 2 at 33; D. 23 ¶ 28; D. 5 ex. 4 ¶¶ 46-47. However, to the extent that the purpose of a formal written complaint is to ensure that the complaint is memorialized in writing from a legitimate source, such was certainly the case before the Investigation Committee undertook their work, before Briggs appeared for the June 13th hearing and before the Board considered its termination of Briggs.

*3. SAMS' Investigation of the Complaint Against Briggs*

Lobley appointed SAMS Board of Director George Sepel ("Sepel") and SAMS Board of Director and Executive Vice President Stuart McLea ("McLea") to conduct an ethics investigation. D. 23 ¶ 33. Briggs complains that the appointment and work of the investigative committee did not comport with SAMS' termination procedures and was unfair because the committee's report does not reflect any investigation and that it appears that the investigative report was written by McLea only. D. 33 ¶¶ 12-22; D. 23 ex. 2 at 64. Briggs also asserts that any investigation that did occur wasn't performed impartially since Lobley had already told both members of the Investigation Committee, Sepel and McLea, that Briggs had "knowingly provided a fraudulent survey." D. 33 ¶ 16. Briggs also alleges that he never received a copy of any investigative report or recommendation. Briggs' Aff., D. 5 ex. 4 ¶ 97.

SAMS alleges that it did comply with its own rules regarding the investigation of the complaint from Boat/U.S.. D. 22 at 5. SAMS asserts that it received a written complaint from Boat/U.S. along with the survey at issue and two voicemails left by Briggs for SAMS employees,[4] D. 23 ¶ 22, as well as a letter from Briggs that included his synopsis of the incident

[4] The transcripts of Briggs' two voicemails are in the record. Boat/U.S. Opp., D. 18 ex. 1-2. From their content, it is apparent that Briggs knew that the basis of the Boat/U.S. complaint was the Hirschberg survey work.

and supporting emails, D. 23 ¶¶ 29-31, and that all of these materials were considered by the Investigation Committee. D. 23 ¶ 33. On May 21, Lobley sent Briggs a letter providing notice of his suspension, and stating that he could appeal his suspension at the June 13 Board of Directors meeting, which Briggs did. D. 23 ex. 2 at 62; D. 23 ¶ 36. The letter further advised Briggs of advised of his right to bring witnesses or an advisor to the hearing, and laid out the procedure to be followed at the hearing. D. 23 ex. 2 at 62.

*4. SAMS' Hearing Regarding Termination of Briggs*

On June 13, 2012, Briggs appeared before the Board of Directors regarding his suspension. D. 23 ¶¶ 36-38; D. 5 ex. 4 ¶ 85. In his affidavit, Lobley states that prior to the Board of Directors' meeting with Briggs, the committee presented its findings to the Board in a closed session. D. 23 ¶ 35. After Briggs appeared for his hearing, Sepel read Briggs the list of violations of the SAMS Code of Ethics that the ethics committee had found that Briggs violated. D. 23 ¶ 36. Briggs then was given the opportunity to present witnesses and evidence. D. 23 ¶¶ 36-37. Briggs did not bring witnesses, but presented an affidavit by Hirschberg and copies of the supporting emails that Briggs had previously submitted. D. 23 ¶ 37. Hirschberg's affidavit stated that Hirschberg had submitted Briggs' "preliminary and unfinished" survey without mentioning that it was not complete, and opined that there had been a "miscommunication about the nature of the survey." D. 23 ex. 2 pp. 67-71, ¶ 17-18. Lobley states that the Board reviewed Briggs' evidence "after [Briggs] left the room" but that since the "affidavit present was not fully signed or notarized, . . . we feared [it] might not be accurate. Also, there were issues with the authenticity of the emails." D. 23 ¶ 37. On June 27, Lobley sent Briggs a letter informing him

---

In the first voicemail to the underwriter on April 27, Briggs states, "[y]ou called about questions and I know what they are" and then explains that he did not conduct a full survey. D. 18 ex. 1 at 1, 2:3-4; D. 18 ex. 1. In the second voicemail to Spahr on April 30, Briggs states, "The underwriter called me once and has not returned my calls for a few days. And what's happened? They've said they won't accept the survey. Well, they should damn well know that it's not done yet." D. 18 ex. 2 at 2:21-24 & 3:1.

that, "[u]nfortunately, the Board decision was not favorable to your appeal and your membership with SAMS® has been terminated." D. 23 ex. 2 at 72.

*5. The Court Cannot Conclude That Briggs Has a Likelihood of Success on the Merits*

Briggs has raised questions about whether SAMS' suspension and termination policies were fair and reasonable and were carried out by the organization in good faith. Such allegations certainly state a plausible due process claim. Whether SAMS failed to comply in all respects with its own written policies and procedures in its action against Briggs may be strong evidence in his favor, but the Court cannot conclude that Briggs has a reasonable likelihood of showing that SAMS' actions were not the result of fair proceedings executed in good faith. Here, there was a process of consideration and appeal afforded to Briggs that began with the initial vote by the entire Board of Directors before a temporary suspension. The full Board vote provided Briggs with more process, not less, than what was required by the SAMS suspension requirements, which required only a vote by the Executive Board. This temporary action on April 30 was followed by notice to Briggs of a full hearing on the merits to be held over a month later on June 13, again before the full Board. There was notice to Briggs of the charges both in writing and at the subsequent hearing, an investigation of the charges by a committee appointed by the President, Briggs was given an opportunity to defend himself at the hearing and to put on evidence in his defense and a hearing in which Briggs participated. Accordingly, the Court cannot conclude that Briggs has made the "clear showing" of likely success, i.e., whether SAMS' procedures to suspend and then terminate Briggs comported with "reasonable standards of due process and fairness," McCune, 237 So. 2d at 172, that must exist to warrant the "extraordinary remedy" of a preliminary injunction. Winter, 555 U.S. at 7. That is, while Briggs may ultimately be successful on his due process complaint, the Court cannot say that Briggs has such

a likelihood of success warranting the grant of the extraordinary relief of reinstatement into SAMS or the other injunctive relief sought.

**B. In the Absence of Likelihood Of Success, Any Risk of Irreparable Harm Does Not Warrant the Injunctive Relief Sought**

Briggs, as the party moving for a preliminary injunction, also has the burden of demonstrating that a denial of a preliminary injunction would cause irreparable harm. Ross–Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18 (1st Cir. 1996) (noting that "[t]o establish irreparable harm . . . the plaintiff shows that its legal remedies are inadequate"). Briggs alleges that irreparable arises here from the potential future loss of insurance, Briggs Aff. D. 5 ex. 4 ¶¶ 107-109, the loss of all surveying revenue from jobs requiring an accredited surveyor, id. ¶¶ 110-112, the inability to seek accreditation from other organizations, id. ¶ 113, potential damage to his plans for retirement and desire to work as a marine surveyor, id. ¶¶ 114-115, and "permanent damage to [his] reputation and standing," id. ¶ 117. Briggs points to lost business and no referrals "during the busiest time of the year" as evidence of irreparable harm. Briggs Suppl. Aff., D. 33 ¶ 39-40. SAMS argues that Briggs will not suffer irreparable harm if an injunction is denied because "SAMS is merely a professional organization [and] Briggs can continue to work and earn a living, as an independent surveyor (as many do) and/or opt to join another professional surveying organization." D. 22 at 14.

The Court finds that Briggs' allegations of potential harm arising from SAMS' actions are speculative and not amenable to the Court's issuance of preliminary injunctive relief. Pub. Serv. Co. of N.H. v. Town of W. Newbury, 835 F.2d 380, 383 (1st Cir. 1987) (collecting cases and holding that "[s]peculative injury does not constitute a showing of irreparable harm"). On this record, any loss of insurance at this point is hypothetical and any resulting loss of work due to termination of insurance is amenable to a remedy at law. Briggs claimed at oral argument on

that he had been denied membership in the National Association of Marine Surveyors ("NAMS") but that he was unsure why he was rejected. Even assuming Briggs was rejected by NAMS for reasons related to the Hirschberg survey, it is not clear whether such rejection is due to SAMS' actions, or for other reasons (for example, Briggs' underlying actions that led to his initial suspension). Again, any resulting loss of work can be remedied by a claim for damages if Briggs is successful.

The Court acknowledges that loss of accreditation and membership can result in reputational harm and that "[b]y its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages." Ross-Simons, 102 F.3d at 20. But potential damage to reputation does not always warrant preliminary injunctive relief. Sampson v. Murray, 415 U.S. 61, 91-92 (1974) (holding that "[a]ssuming for the purpose of discussion that respondent . . . had supported the claim that her reputation would be damaged as a result of the challenged agency action, we think the showing falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction").

While the Court understands the current and future hardship facing Briggs, "an insufficiency of savings or difficulties in immediately obtaining other employment . . . will not support a finding of irreparable injury, however severely they may affect a particular individual." Sampson, 415 U.S. at 92 n.68; see also Nedder v. Rivier College, 908 F. Supp. 66, 83 (D.N.H. 1995) (noting that "[i]t is well established that 'temporary loss of income, which can be recouped at the end of a trial, does not usually constitute irreparable injury.' Therefore, the fact that Ms. Nedder is currently unemployed and unable to earn a living in her chosen profession does not constitute irreparable harm") (internal quotations omitted). If Briggs prevails on the merits against SAMS, he can pursue money damages and these would "suffice to compensate for any

loss of additional revenue attributable" to work lost due to his SAMS suspension and termination. Foreign Motors, Inc. v. Audi of Am., Inc., 755 F. Supp. 30, 33 (D. Mass. 1991).

### C. Balancing of Harms

Defendant SAMS argues that the "organization and its membership are only as strong as its weakest link. [B]eing forced to reinstate a member who has clearly demonstrated unethical behavior . . . would cause all of SAMS' nearly 1000 members [to] suffer." D. 22 at 15. SAMS argues that Briggs' continued membership "could hurt the business relationships between SAMS and other [organizations] that accept surveys conducted by SAMS members." Id. "SAMS is a voluntary professional organization and should not be forced to reinstate a member that has violated its Code of Ethics and who tarnishes its reputation through his behavior." Id. In contrast, Briggs alleges that he has essentially lost his livelihood, and risks "permanent stigma within his professional field." Pl. Mem., D. 12 at 22. The Court credits both concerns and does not find that one concern outweighs the other.

### D. Denying an Injunction Is Consistent With the Public Interest

The plaintiff must show that the requested injunction fits, or at least does not conflict, with the public interest. Nieves-Márquez v. P.R., 353 F.3d 108, 120 (1st Cir. 2003). SAMS argues that the public interest requires denial of injunctive relief. Its reasoning is that "SAMS, through its investigation, has found that Briggs submitted a fraudulent survey," and that "members of the public who rely on surveys conducted by SAMS members due to their positive reputation in the community, could be injured if Briggs is allowed to continue to conduct surveys as a SAMS member." D. 22 at 16. Briggs argues that SAMS' "finding" that Briggs submitted a fraudulent survey is in doubt where its methodology in reaching that conclusion has been challenged. However, given the record now before the Court, the prudent way to serve the

public interest is not through preliminary injunctive relief, but trial on the merits of the underlying claims.

## V. Conclusion

For all the aforementioned reasons, the Court declines to order the injunctive relief sought by Briggs. The Court, however, will consider an expedited discovery and trial schedule for this matter.

**So Ordered.**

**/s/ Denise J. Casper**
**United States District Judge**