UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DANIEL C. BRIGGS, **Plaintiff**, | ) ) ) ) | |
| v. | ) ) | C.A. No. 12-11795 |
| BOAT/U.S., INC. and SOCIETY OF ACCREDITED MARINE SURVEYORS, INC., **Defendants.** | ) ) ) ) ) ) | |

**PLAINTIFF'S RULE 56.1 SEPARATE STATEMENT OF FACTS IN
SUPPORT OF HIS OPPOSITION TO DEFENDANT
BOAT/U.S., INC.'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Plaintiff Daniel C. Briggs respectfully submits the following statement of facts as to which a genuine issue must be tried, in opposition to Defendant Boat/U.S.'s Motion for Summary Judgment.

1. In early April, 2012, Daniel Briggs, a marine surveyor working out of Mattapoisett, Massachusetts, was hired by a past client, Ronald Hirschberg, to update a 2005 survey he had performed on Hirschberg's 1988 "Sabre 42" sailboat. Hirschberg intended to change insurers – to Defendant Boat/U.S. *See* Affidavit of Daniel C. Briggs, at ¶¶ 13-19, **Ex. 1** hereto.

2. When Briggs went to inspect the boat at a nearby boatyard on April 11, however, it was hemmed in by other boats, and he could not climb aboard using a ladder without causing damage to Mr. Hirschberg's boat or others. *Id.* at ¶¶ 20-22.

3. Briggs inspected the underside of the boat and the "rig" – the external drive mechanism – and learned from the boatyard that the vessel had been yard-maintained since 2005, had not been used at all for more than a year, was in excellent

condition, and would be available for full inspection within a week or two. *Id.* at ¶¶ 23-24.

4. Because Hirschberg's timeframe was tight – his existing policy was due to run shortly – Briggs agreed to submit a draft survey (the "Draft Survey") to Hirschberg that he could provide to his insurer to let it know the survey was underway, and would be completed as soon as the boat could be accessed. *Id.* at ¶ 25-27.

5. On April 13, 2012, Briggs emailed the Draft Survey – which contained none of the usual hallmarks of his final surveys, to Hirschberg, clearly stating in the e-mail (as he had emphasized in their phone discussions) that he had not yet gotten aboard the boat, or completed his inspection: "I will get aboard the boat ASAP." *Id.* at ¶ 29; **Ex. 2** thereto, **Ex. 1** hereto.

6. Briggs left the Draft Survey unsigned, did not put it on his letterhead, did not place his SAMS seal on it, and did not even change all of the date information from the 2005 survey.  Briggs e-mailed the survey to his client only. *See* Briggs Aff. at ¶ 30; Draft Survey, at 1, 15-16, **Ex. 3** thereto.

7. Hirschberg fully understood that this was not a final or complete survey, and that it was being submitted just to "move the [insurance] process forward." *See* Deposition of Ronald Hirschberg at 36:4-38:3, **Ex. 2** hereto.

8. Hirschberg then forwarded the Draft Survey on to Boat/U.S. on April 19, but neglected to advise them that it was incomplete and not intended to be a final survey of the vessel. *See* Hirschberg Depo. at 101-102.

9. Hirschberg believed that the survey itself made its "draft" status clear, and assumed that Boat/U.S. would recognize it as such, or alternatively, that Briggs was going to advise Boat/U.S. that the survey was a draft. *See id.*, at 101-102.

10. Hirschberg later learned that Briggs believed that Hirschberg was going to advise Boat/U.S. that the draft survey was not intended to be "final." *Id.*

11. It was a pure misunderstanding; there was no intention on either Briggs's or Hirschberg's part to deceive Boat/U.S. *See id.*, at 102; 108-109.

12. SAMS admits that Briggs's submission of the report to his client, rather than directly to the insurer, is typical in the industry. *See* Rule 30(B)(6) Deposition of SAMS (by Joseph Lobley, "SAMS Depo."), at 34:19-35:20, **Ex. 3** hereto.

13. Bruce Spahr, an underwriting manager at Boat/U.S., had had past conflict with Briggs, and remembered this history when his employee Cheryl Trosky brought the Draft Report to him with questions. *See* Rule 30(B)(6) Deposition of Boat/U.S. (by Bruce Spahr), at 63:11-17, **Ex. 4**.

14. Despite this conflict, Boat/U.S. had never, to Spahr's knowledge, rejected a Briggs survey, over many years of submissions. *See* Boat/U.S. Depo. at 85:11-86:5, **Ex. 4** .

15. Spahr admits that the sort of questions he had concerning the Draft Report and had previously had concerning Briggs's past surveys were typical of "all surveyors;" that such issues arise with other surveyors' reports on a "daily" basis; and that such issues do not single Briggs out or distinguish him from all other surveyors. *Id.* at 88:17-89:12.

16. Spahr further admits that "Boat/U.S. rejects marine surveys on a fairly routine basis," but that when there are questions, "we will try to work and do everything we can to accept it." *Id.* at 91:6-13.

17. With most surveyors, Spahr just tries to work out a resolution:

". . . Now it is not the first time I've gotten a situation where a surveyor could not complete a survey and have submitted a report. In that case I would go back to

the surveyor and say, okay, why couldn't you get on the boat? What is the issue? And then we would work out a resolution."

Boat/U.S. Depo. at 201:19-202:3.

### Spahr Singled Briggs Out

18. Spahr did nothing of the sort after receiving the Draft Report. Before anyone at Boat/U.S. ever discussed the report with Briggs, Spahr jumped to the conclusion that the incomplete report had been "falsified." *See* Spahr Claim Note, Ex. 5 to Boat/U.S. Depo., **Ex. 14** hereto; Boat/U.S. Depo. at 133:8-134:13, **Ex. 4**.

19. Briggs clearly advised Boat/U.S. in a voicemail on April 27 that he had not completed the survey, nor intended it to be viewed as a final draft. *See* Transcript of Briggs Message, April 27, **Ex. 8** to Boat/U.S. Motion for Summary Judgment ("Boat/U.S. Motion").

20. There was nothing defensive, hot-tempered, defiant, or inappropriate about Briggs's April 27 message, and the content was consistent with Hirschberg's explanation to Spahr on the same day. *See id.*; *see also* Hirschberg Depo. at 109:16-110:17; **Ex. 2**.

21. On April 27, Spahr also spoke to Hirschberg, who told him that he had always known that the Draft Report was not complete, that Briggs had not been able to access the whole boat, and that Briggs had only intended that the Draft Survey be used to get the insurance process going. *See* Hirschberg Depo. at 109:16-110:17; **Ex. 2**.

22. By April 27, Boat/U.S./Spahr had received no evidence that Briggs had intentionally or otherwise misrepresented the report to either Hirschberg or to Boat/U.S. as complete or final. *See* Transcript of Briggs Message, April 27, **Ex. 8** to Boat/U.S. Motion; Hirschberg Depo. at 109:16-110:17; **Ex. 2**.

4

23. Because it was Briggs and not some other surveyor, Spahr did not "try to work and do everything we [could] to accept" the survey or understand the circumstances. *See* Boat/U.S. Depo. at 91:6-13, **Ex. 4.**

24. Hirschberg disagreed with Boat/U.S.'s assessment of Briggs's competence, and thought their attack on his "ethics" was unwarranted and inappropriate, and said as much to their representative. See Hirschberg Aff. at ¶ 20.

25. Instead, Spahr stated to Hirschberg that: (a) Boat/U.S. was "rejecting" Briggs's survey; (b) Spahr had had "past issues" with Mr. Briggs as a surveyor; (c) what Briggs had done was "unethical;"[1] (d) that Hirschberg should not pay Briggs for his work; and (e) that Hirschberg must choose a new surveyor from an approved list it was providing him to do a new survey. Hirschberg Aff. at ¶¶ 19-20, **Ex. 5;** *see* Boat/U.S. Depo., at 284:4-9.

26. Hirschberg did as he was told. *See* Hirschberg Depo., at 49:11-18.

27. The same day, Spahr contacted Joe Lobley, SAMS' President and made several statements he knew to be untrue and later memorialized in an email and letter, including that Briggs had "submitted a final draft [the Draft Survey] to the owner [Hirschberg] with no indication that he never went aboard the vessel," which Spahr had been told by both Briggs and Hirschberg was not true. *See* Boat/U.S. Depo. at 238:15-240:2; Complaint E-mail, **Ex. 11** to Boat/U.S. Motion.

28. Spahr does not dispute that by saying this, he meant to advise SAMS that Briggs had misled his client, Hirschberg, as to the nature of the survey, but admits that he doesn't know that that was true. *See* Boat/U.S. Depo. at 231:13-233:1; 238:15-240:2.

---

[1] Hirschberg disagreed with Boat/U.S.'s assessment of Briggs's competence, and thought their attack on his "ethics" was unwarranted and inappropriate, and said as much to their representative. See Hirschberg Aff. at ¶ 20.

29. Spahr also stated to Lobley that Briggs's submission of the Draft Report to Hirschberg was a "misrepresentation." *See id.*, at 238:15-240:2; Complaint E-mail, **Ex. 11** to Boat/U.S. Motion.

30. Spahr further admits that he did not, and does not know whether Briggs misrepresented anything to Hirschberg. *See* Boat/U.S. Depo. at 231:13-233:1.

31. Spahr sent an email to Lobley that put these complaints in writing on or about May 2, 2011. *See* Complaint E-mail, **Ex. 11** to Boat/U.S. Motion.

32. Spahr also later – on or about May 21, 2011 – sent Lobley/SAMS a "formal written complaint" in letter form with the same content as the earlier e-mail, re-iterating the earlier false statements concerning Briggs. *See* Rule 30(b)(6) Deposition of SAMS, Inc. (Joseph Lobley) at 206:1-207:2; Complaint Letter, Dated May 9, 2011, **Ex. 16** to SAMS Depo., **Ex. 6** hereto.

33. At each of these times, Spahr either knew the statements referenced above to be untrue, or did not know whether they were true or not. *See* Boat/U.S. Depo., at 231:13-233:1; 238:15-240:2.

34. Spahr intended these statements to be taken as fact, and Lobley believed them and understood them to be fact. *See* Boat/U.S. Depo. at 231:13-233:1; SAMS Depo. at 168:6-169:13.

35. Spahr repeatedly acknowledged at deposition that in making his statements to Hirschberg and in submitting his "complaint" to Lobley, he was stating as *fact* that Briggs had been untruthful. *See* Boat/U.S. Depo., at 276:15-279:3.

36. Lobley has likewise testified under oath that he understood these specific accusations of knowing misrepresentation to be fact:

> "Q: . . .Mr. Daniel Briggs has violated  . . . SAMS code of ethics and rules of practice by knowingly providing a fraudulent survey." . . .
> A: Yes. . . .
> Q:  Okay, but you state it as fact, correct?
> A:  Yes.
> Q: And to your understanding that fact, those facts were provided to you by Bruce Spahr, correct? . . .
> A:  Correct, along with the evidence, yes."

*See* SAMS Depo., at 168:6-24.

37. Contrary to what Boat/U.S. now claims – that Lobley knew from the start that Briggs had not deceived Hirschberg – Lobley has testified that he did not, and does not know that; in other words, he believed what Spahr had advised him. *See* SAMS Depo. at 168:6-170:9.

38. Lobley has testified that the knowing deception Spahr reported was decisive in his and the Board's case against Briggs; and that it was so heinous as to obviate the need for him to discuss the matter with Hirschberg:

> "Q. The information that you stated here, that he knowingly provided a fraudulent survey, what does that mean?
> A. Using the fraudulent -- the definition of "fraudulent," designed to deceive, you know, something that's untrue, something that can't be relied on.  I think it's right out of the dictionary
> Q. Okay.  So what did you mean by he knowingly provided a fraudulent survey?
> A. He gave the owner of the boat a survey that had misinformation on it, or misrepresentation of the facts.
> Q. Was he knowingly deceiving his client as to what the survey was or what it wasn't?
> A. I'm not sure.  I have never spoken to Mr. Hirschberg about his boat and the survey.
> Q. Well, you stated he knowingly provided a fraudulent survey.  Who was he knowingly deceiving, as you sort of defined it?
> A. He was obviously deceiving the insurance company and perhaps the boat owner, but I haven't been able to -- I've never spoken with the boat owner.  And the reason why we claim it's knowingly is that in his report he never -- it doesn't even contain a paragraph that says scope of work or a description of the survey, and never accurately explained the survey process.  He never explained that he hadn't gone aboard the boat.
> Q. He explained that to his client, right?
>  A. I'm unaware of that."

*See* SAMS Depo. at 168:6-170:9; *see also* 194:3-198:9 (e-mails with Hirschberg show a misunderstanding; SAMS disregarded them as fraudulently "inserted").

7

39. Lobley reported to the SAMS Board of Directors on April 30, 2011 in a "Polled Vote Request" that Briggs had violated a number of SAMS ethical rules by "knowingly providing a fraudulent survey." *See* Boat/U.S. Depo. at 203:1-204:6; Polled Vote Request, Ex. 18 to SAMS Depo., **Ex. 7** hereto.

40. No one from SAMS ever spoke to Hirschberg to ask if Briggs had deceived him as to the nature of the survey, they disregarded as not credible e-mails between Briggs and Hirschberg in which Hirschberg acknowledged that the submission of the survey without qualification was a misunderstanding, and Lobley/SAMS dismissed as "possibly forged" an affidavit Hirschberg provided to Briggs to support his appeal of the May 4 SAMS suspension. *See* SAMS Depo. at 202:16-205:20.

41. As Spahr submitted his "formal written complaint" he admonished Lobley to "keep me updated so we can put this one to bed." May 16 E-mails Between Spahr/Lobley, Ex. 12 to SAMS Depo., **Ex. 8** hereto.

42. After Lobley/SAMS had terminated Briggs, Spahr rewarded Lobley with *ten new direct survey assignments* – part of Lobley's ongoing business relationship with Boat/U.S. *See* SAMS Depo. at 79:11-80:14.

43. Spahr admits that barring Briggs from ever submitting surveys to Boat/U.S. would sufficiently protect Boat/U.S. from Briggs – there was nothing for Boat/U.S. to be gained by pursuing Briggs with SAMS. *See* Boat/U.S. Depo. at 153:6-16.

44. As Spahr admits, he had already served that interest by internally blacklisting Briggs:

> "Q: In this instance, you say [making the complaint to SAMS] wasn't out of any interest for Boat/U.S. in particular, correct, because you had already made the decision that you were not going to accept surveys from . . . Briggs. Correct?
> A: Correct."

*See* Boat/U.S. Depo. at 155:3-11.

46. Briggs does not agree that Spahr "should" have reported his complaint to SAMS. *See* Briggs Depo., at 221:16-222:22, **Ex. 9.**

46. Boat/U.S. and SAMS had a business relationship that included (without limitation) a term requiring SAMS guarantee a certain number of surveyors would maintain memberships with Boat/U.S. and that Boat/U.S. would provide half-price memberships to SAMS surveyors. *See* SAMS Depo., at 163:13-17; Boat/U.S.-SAMS Agreement, Ex. 21 to Boat/U.S. Depo., **Ex. 10** hereto.

### Briggs's Damages

47. As a result of losing his SAMS accreditation, Briggs has been unable to service all but a few of the customers who have sought his assistance. *See* Plaintiff's Supp. Ans. to Interrogatories at 16, **Ex. 11** hereto.

48. In the first half of 2013, the first full year following SAMS's termination of his accreditation, Briggs was only able to earn just over $4,000 from surveying. *See* Briggs Income/Expense Summary, 2013, **Ex. 12**.

49. Briggs's expert witness on damages, Dana Hewins, estimates his losses over the course of the remainder of his career at $395,682-$457,290. *See* Hewins Damages Report at 6, **Ex. 13**.

                          PLAINTIFF DANIEL C. BRIGGS,

                          By his attorneys,

                          */s/ Matthew J. Ginsburg*
                          Matthew J. Ginsburg (BBO No. 641089)
Date: December 9th, 2013     GILBERT & RENTON LLC
                          344 North Main Street
                          Andover, MA 01810
                          Telephone: (978) 475-7580
                          Facsimile: (978) 475-1881

## **CERTIFICATE OF SERVICE**

     I, Matthew J. Ginsburg, hereby certify on this 9th day of December, 2013, that I filed the foregoing on the CM/ECF system and served on all counsel of record.

                                      */s/ Matthew J. Ginsburg*
                                      Matthew J. Ginsburg