UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
)
)
DANIEL C. BRIGGS,                       )
)
Plaintiff,                 )
)
v.                     )        Civil Action No. 12-11795-DJC
)
BOAT/U.S., INC. and SOCIETY OF          )
ACCREDITED MARINE SURVEYORS,            )
INC.,                                   )
)
Defendants.                )
)
_____)


MEMORANDUM AND ORDER

CASPER, J.                                              September 16, 2014

I.      Introduction

Plaintiff Daniel C. Briggs ("Briggs") has brought this lawsuit against Defendants Boat/U.S., Inc. ("BoatUS") and the Society of Accredited Marine Surveyors, Inc. ("SAMS") (collectively, "Defendants") arising from Briggs's membership suspension and termination from SAMS.  D. 54.  Briggs has alleged violation of due process against SAMS (Count 1); defamation against BoatUS (Count 2); tortious interference with prospective business relationships against both Defendants (Count 3); violation of Mass. Gen. L. c. 93A, § 11 against both Defendants (Count 4); and civil conspiracy (Count 5).   Second Amended Complaint ("SAC"), D. 54. Defendants have now moved for summary judgment on all claims.  D. 71, 72.  For the reasons discussed below, the Court ALLOWS IN PART and DENIES IN PART BoatUS's motion for

summary judgment, D. 71, and ALLOWS IN PART and DENIES IN PART SAMS's motion for summary judgment, D. 72.

## II.     Factual Background

The facts recited are as presented in Defendants' statements of facts, D. 73, 80, and, except as otherwise noted, are undisputed by Briggs.  D. 88, 90.

BoatUS is a for-profit national boating club that sells marine insurance.  D. 73 ¶ 14; D. 88 ¶ 14.  Before issuing an insurance policy, BoatUS required boat owners seeking insurance to provide a marine survey describing the boat's specifications, measurements, condition and an estimate of the boat's value.  Id. ¶¶ 15-17.

In 2005, boat owner Ronald Hirschberg ("Hirschberg") hired Briggs, a marine surveyor, to perform an insurance survey of his boat.  Id. ¶¶ 2, 18.  In April 2012, Hirschberg hired Briggs again to perform an additional survey because he was switching to BoatUS as his insurer.  Id. ¶ 19.

According to Briggs, when he went to survey Hirschberg's boat, he was unable to access it and inspected only the underside and rig.  Id. ¶ 21.  On April 13, 2012, Briggs sent, via e-mail, a fifteen-page survey report to Hirschberg, entitled "Marine Survey Report."  D. 80 ¶ 12.  Briggs did not write the words "draft," "not completed," "to be completed," or "partial" anywhere on the survey. D. 73 ¶ 24.  Hirschberg forwarded the survey to BoatUS on April 19, 2012.  Id. ¶ 27. Hirschberg did not indicate in the email to BoatUS that the survey was a draft or incomplete.  Id. ¶ 28.

After receiving the survey, Cheryl Trosky ("Trosky") of BoatUS, noticed that the date of the first page of the survey indicated the year 2012, while the date on the last page indicated the year 2005.  Id. ¶ 33–34.  Trosky brought the survey to the attention of Bruce Spahr ("Spahr"),

head of underwriting at BoatUS, who instructed Trosky to call Briggs to clarify the inconsistency.  Id. ¶ 35.  In an April 27, 2012 voice message to Trosky, Briggs admitted that he had not been onboard the boat in 2012 to survey it.  Id. ¶ 37.  Hirschberg later told Spahr that Briggs had informed Hirschberg that he could not get on the boat, but would complete the inspection at a later date.  Id. ¶ 40.

SAMS is a professional society that offers accreditation to member surveyors.  Id. ¶¶ 7, 10.  Prior to June 27, 2012, Briggs was a SAMS member.  Id. ¶ 3.  On April 27, 2012, Spahr called Joseph Lobley ("Lobley"), SAMS president, to inform Lobley of Brigg's conduct.  Id. ¶ 57.  BoatUS later filed a written complaint regarding Briggs, attaching copies of two voicemails from Briggs.  Id. ¶ 60.

On April 30, 2012, pursuant to SAMS policy, Lobley sent a Polled Vote Request to the SAMS board of directors ("the Board") regarding Briggs's immediate temporary suspension from the organization.  Id. ¶ 63.  The Board voted unanimously for Briggs's immediate temporary suspension beginning May 4, 2012, citing the SAMS policy.  Id. ¶ 65.

Briggs requested an appeal hearing.  Id. ¶ 68.  SAMS appointed two members to conduct an ethics investigation.  Id. ¶ 69.

The SAMS Ethics Committee found Briggs in violation of the Code of Ethics and Practice provisions requiring members to "[b]e competent, prompt, diligent and demonstrate respect for the survey profession.  (Competence requires knowledge, skill, thoughtfulness, and preparation reasonably necessary for the assignment) . . . [a]ccept only assignments that can be completed with professional competence . . . [and] [r]efrain from suppressing, over-emphasizing or manipulating facts."  Id. ¶ 76.  The Committee's findings were presented to the Board during a

closed ethics session the day before the Board meeting when Briggs's hearing was scheduled. Id. ¶ 77.

At the Board meeting the following day, June 13, 2012, Briggs was permitted to present his position, id. ¶ 86, but he contends that the hearing was unfair for a number of reasons including his inability to question witnesses.   D. 88 ¶ 86.   The Board ratified Briggs's suspension.   D. 73 ¶ 78.   In a letter dated June 27, 2012, SAMS notified Briggs that his membership would be terminated.   Id. ¶ 96.

## III.   Procedural History

Briggs initiated this lawsuit in Plymouth Superior Court on September 17, 2012.  D. 1 ¶ 2.  The case was removed to this Court on September 27, 2012.  Id.  Briggs filed his second amended complaint on February 19, 2013.  D. 54.  Defendants subsequently moved for summary judgment.  D. 71, 72.  After a hearing, the Court took this motion under advisement.  D. 99.

## IV.   Standard of Review

The Court may grant summary judgment when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law based on the undisputed facts.  Fed. R. Civ. P. 56(a).  "An issue is genuine if the evidence of record permits a rational factfinder to resolve it in favor of either party."  Borges ex. rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010) (citation and quotations omitted).  "A fact is material if its existence or nonexistence has the potential to change the outcome of the suit."  Id. at 5.

Once the moving party meets its burden of showing that there are no genuine issues of material fact, "the burden shifts to the nonmoving party, who must, with respect to each issue on which [he] would bear the burden of proof at trial, to demonstrate that a trier of fact could reasonably resolve that issue in [his] favor," id. (citation omitted), by presenting "specific

admissible facts." Id. "If the nonmovant fails to make this showing, then summary judgment is appropriate." Id.

"[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The moving party "need only show that there is an absence of evidence in support of at least one element of [its] case in order to succeed on summary judgment." Cellco P'ship v. Town of Grafton, Mass., 336 F. Supp. 2d 71, 82 (D. Mass. 2004) (citation omitted). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## V.     Discussion

### A.     The Court Allows in Part BoatUS's Motion for Summary Judgment, But Only as to the Civil Conspiracy Claim

#### 1.     Defamation

BoatUS argues that Briggs cannot prove his defamation claim because the record provides no evidence that BoatUS made a false statement or that Briggs incurred damages from any of BoatUS's statements. D. 81 at 11.

A defendant is liable for defamation if it publishes a "false statement regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either causes economic loss or is actionable without proof of economic loss." White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 66 (2004). "The test to be applied as to the defamatory character of published words is whether in the mind of any considerable and respectable class of the community they tend to injure the reputation of the person to whom they refer and expose him to hatred, ridicule and contempt." Rawson v. Arlington Advocate, Inc., 336 Mass. 31, 33-34

(1957) (citations omitted).   An opinion cannot constitute defamation unless it "implies the allegation of undisclosed defamatory facts as the basis for the opinion."   Nat'l Ass'n of Gov't Emp., Inc. v. Cent. Broad. Corp., 379 Mass. 220, 227 (1979) (quotation omitted).

    i.  Falsity

   Briggs relies upon statements that he contends were defamatory:  (1) Spahr's statement to Lobley in his written complaint that Briggs submitted a final draft to Hirschberg with no indication that he never went aboard the vessel; and (2) Spahr's statement to Lobley in his written complaint that Briggs's submission of the survey was a "misrepresentation."  D. 89 at 9.

   The Court concludes that there is a genuine issue of material statement as to whether at least the first statement was defamatory.  In the "formal complaint" dated April 31, 2012, Spahr wrote:

> [Briggs's] reports routinely have shown to have errors and consistently lack details compared to other SAMS surveys we review. Last week we received a survey he performed for Mr. Ron Hirschberg on his 1988 Sabre 42'. Again this particular survey lacked detail and had errors. Upon review of this report I noted the survey was performed on April 11, 2012 on the first page and had a different date of April 12, 2005 on the last page. To get clarification on the dates I instructed one of my underwriters to call Mr. Briggs to see if this was simply an error or to confirm if the survey had been altered. At the time of the call Mr. Briggs was unavailable. He later returned the call leaving a voice mail. I cannot tell you how shocked I was to hear his response. I learned that the survey was not actually performed because the boat was not accessible. Yet he submitted a final draft to the owner with no indication that he never went aboard the vessel. We then contacted the owner of the boat last Friday to inform him that the survey was rejected because it was never really inspected. I then received a subsequent voice mail from Mr. Briggs over the weekend. I was even more surprised with this second voice mail he left me. On Monday I contacted Mr. Briggs and explained my displeasure with this whole affair due to his misrepresentation. He was then told that Boat US will no longer accept his reports in the future. I have forwarded both voice mails and a copy of the report so you may know first hand why I have taken this action.

D. 81-11 at 2-3.  "'The determination [of] whether the communication complained of is capable of a defamatory meaning is for the court.'"   Reilly v. Associated Press, 59 Mass. App. Ct. 764,

778 (2003) (quoting <u>Jones v. Taibbi</u>, 400 Mass. 786, 792 (1987)).  Here, Spahr's statement that Briggs "submitted a final draft [the Draft Survey] to the owner [Hirschberg] with no indication that he never went aboard the vessel," D. 89 at 9, is susceptible to two interpretations:  (1) Briggs submitted a final draft survey to the owner with no indication in the draft itself that he never went aboard the vessel, or (2) Briggs submitted a final draft to the owner without indicating at all to the owner (in the draft or otherwise) that he never went aboard the vessel.  Given the record, the second interpretation could have defamatory meaning, given the fact that Spahr testified at his deposition that in a telephone conversation with Hirschberg (prior to submitting the written complaint to SAMS), he asked Hirschberg:  "[W]ere you aware that he didn't go aboard the boat[?]"  D. 81-2 at 14.  Hirschberg responded, according to Spahr's testimony, "[h]e told me that . . . [a]nd that later on he would complete the survey."  <u>Id.</u> at 14-15.  Given these facts, Spahr's statement is capable of a defamatory meaning.

"Once the court has determined that a statement is capable of a defamatory meaning, it is for a jury to decide whether the statement was so understood by its recipient."  <u>Reilly</u>, 59 Mass. App. Ct. at 778 (citation omitted).  Therefore, "[w]here the communication is susceptible of both a defamatory and nondefamatory meaning, a question of fact exists for the jury."  <u>Jones</u>, 400 Mass. at 792.  Thus, the Court concludes that there is still a genuine issue of material fact as to whether BoatUS made a false statement.

To the extent BoatUS argues that this statement was an opinion, "[a] statement cast in the form of an opinion may imply the existence of undisclosed defamatory facts on which the opinion purports to be based, and thus may be actionable."  <u>HipSaver, Inc. v. Kiel</u>, 464 Mass. 517, 526 n.11 (2013) (citation and quotation omitted).

ii.     Damages

BoatUS also argues that even assuming it made a false statement, Briggs has not directed the Court to any specific admissible facts showing that he suffered damages as a result of these statements. Briggs asserts that his damages arose from the loss of his SAMS accreditation and his subsequent inability to serve customers. D. 91 ¶ 47; D. 89 at 8-9. He does not address in his motion papers the damages he incurred as a result of BoatUS's allegedly defamatory statements. However, certain types of statements are "actionable without proof of economic loss," including "statements that may prejudice the plaintiff's profession or business." Ravnikar v. Bogojavlensky, 438 Mass. 627, 630 (2003).[1] "A statement falls within this exception to the economic harm requirement if it alleges that the plaintiff lacks a necessary characteristic of the profession." Id. at 631. Although there is no evidence in the record that Spahr published the allegedly defamatory statements to anyone but SAMS, after Spahr made the formal complaint to SAMS, Lobley requested that the SAMS Board immediately suspend Briggs for "knowingly providing a fraudulent survey." D. 91 ¶ 39 (citing Polled Vote Request, D. 89-7 at 2). It is reasonable to conclude here that the allegedly false accusations of submitting a misleading and inaccurate survey would suggest that Briggs lacks a necessary characteristic of the marine surveying profession. As Spahr notes in his affidavit, the integrity of marine surveyors and that surveyors submit "acceptable surveys" are common interests that BoatUS and SAMS, entities in the marine surveying business, share. D. 81-12 at 2. Thus, assuming a factfinder concludes that BoatUS's statement to SAMS was in fact false, it could be actionable without proof of economic damage based on prejudice to Briggs's profession or business.

iii.    Conditional Privilege

---

[1]"If the statement comes within one of these [] exceptions, a plaintiff may recover noneconomic losses, including emotional injury and damage to reputation. . . . An undamaged plaintiff may recover nominal damages." Id.

BoatUS further argues that any statements it made regarding the complaint about Briggs is protected by conditional privilege.  D. 81 at 14.  Conditional privilege applies where parties share a "common and legitimate interest in the communication of [allegedly defamatory] information."  Dragonas v. Sch. Comm. of Melrose, 64 Mass. App. Ct. 429, 438 (2005).  "The conditional privilege is lost if the defendant (1) knew the information was false, (2) had no reason to believe it to be true, or (3) recklessly published the information unnecessarily, unreasonably, or excessively."  Id. (citation and quotations omitted).  "Lastly, the conditional privilege may be lost if the plaintiff proves the defendant acted out of malice."  Id.  As discussed above, assuming a factfinder concludes that the statement Spahr made that Briggs "submitted a final draft to the owner with no indication that he never went aboard the vessel" was false, the conditional privilege would not apply because there is also evidence that Spahr knew the statement was false.  For these reasons, the Court cannot conclude at this juncture that the conditional privilege applies.

Therefore, the Court DENIES BoatUS's motion for summary judgment as to the defamation claim, Count 2.

### 2.    *Intentional Interference with Prospective Business Relations*

To prevail on a tortious interference claim, Briggs must show:  "(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's interference with it through improper motive or means; and (4) [Briggs's] loss of advantage directly resulting from the defendant's conduct."  Am. Private Line Servs., Inc. v. E. Microwave, Inc., 980 F. 2d 33, 36 (1st Cir. 1992) (citing United Truck Leasing Corp. v. Geltman, 406 Mass. 811 (1990)).  BoatUS argues Briggs has not shown an improper motive or means.  D. 81 at 15.  The Court concludes, however, that making defamatory

statements could constitute an improper means of interfering with Briggs's relationship with SAMS, Cavicchi v. Koski, 67 Mass. App. Ct. 654, 658 (2006) (noting that "[i]mproper means include violation of a statute or common-law precept, e.g., by means of threats, misrepresentation, or defamation), and therefore, Briggs's intentional interference claim against BoatUS could rise or fall depending on whether BoatUS defamed Briggs.[2]  Therefore, the Court DENIES BoatUS's motion for summary judgment as to the tortious interference claim, Count 3.

### 3.    Chapter 93A

BoatUS argues that Briggs cannot establish a claim for violation of Mass. Gen. L. c. 93A. D. 81 at 17.  Chapter 93A prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. L. c. 93A, § 2A.  BoatUS asserts that "there is no evidence upon which to determine that an unfair or deceptive trade practice has occurred."  D. 81 at 18.  However, in light of the ruling above, there remains a factual issue as to whether BoatUS defamed Briggs which may support a 93A claim.  See A.F.M. Corp. v. Corporate Aircraft Mgmt., 626 F. Supp. 1533, 1551 (D. Mass. 1985) (concluding that defamation is actionable under 93A).

BoatUS also argues the 93A claim fails because no commercial transaction occurred between Briggs and BoatUS.  D. 81 at 18.  Chapter 93A, § 11 "requires that there be a commercial transaction between a person engaged in trade or commerce [and] another person engaged in trade or commerce."  Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 23 (1995).  However, a plaintiff "need not establish privity of contract so long as the parties are engaged in more than a minor or insignificant business relationship."  Baker v. Goldman Sachs

---

[2]The Court notes that to the extent Briggs argues that Spahr had an improper motive based on "prior conflict and [a] past complaint concerning Briggs," D. 89 at 17, "personal dislike" is not sufficient to satisfy the improper motive or means element of a tortious interference claim.  Cachopa v. Town of Stoughton, 72 Mass. App. Ct. 657, 663 (2008).

& Co., 656 F. Supp. 2d 226, 239 (D. Mass. 2009) (internal citations and quotations omitted).

When there is evidence of an "active, three-way negotiation," 93A's transaction requirement

may be satisfied.  Chestnut Hill Dev. Corp. v. Otis Elevator Co., 653 F. Supp. 927, 933 (D.

Mass. 1987) (denying defendant's motion for summary judgment on a 93A, § 11 claim, despite

lack of direct contractual relationship between the parties, because plaintiff was a "third party

beneficiary" and an "active participant" in negotiations); Reisman v. KPMG Peat Marwick LLP,

57 Mass. App. Ct. 100, 125a (2003) (reversing grant of summary judgment in part because firm

was "in direct contact [with the plaintiff] during the transaction").  Here, it appears BoatUS

contacted Briggs directly to discuss the quality of the survey.  D. 81-2 at 67-68.  Spahr,

BoatUS's Manager of Underwriting, contacted Hirschberg and told him BoatUS "could not

accept the survey."  Id. at 68-69.  Hirschberg stated "BoatU.S. informed me . . . I would have to

get a different surveyor."  D. 86-2 at 3; see Nei v. Boston Survey Consultants, Inc., 388 Mass.

320, 324 (1983) (dismissing a 93A claim against a real estate surveyor by a home purchaser due

to lack of privity because, in part, the defendant "made no misstatements to the plaintiffs or to

anyone else").  Here, the record indicates direct contact and potential misstatements regarding

the transaction such that a jury could find a business transaction occurred between BoatUS and

Briggs for the purposes of 93A.  Accordingly, the Court DENIES BoatUS's motion for summary

judgment as to the 93A claim.

### 4. *Civil Conspiracy*

"Massachusetts recognizes two types of civil conspiracy, so-called 'true conspiracy' . . .

and a form of vicarious liability for the tortious conduct of others."  Taylor v. Am. Chemistry

Council, 576 F.3d 16, 34 (1st Cir. 2009) (citing Kurker v. Hill, 44 Mass. App. Ct. 184 (1998)).

Briggs asserts the second type of civil conspiracy, D. 89 at 18, requiring:  "first, a common

design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement." Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994); see also Bartle v. Berry, 80 Mass. App. Ct. 372, 383-84 (2011).   Here, considering the facts in the light most favorable to Briggs and making reasonable inferences in his favor, Briggs has directed the Court to no specific, admissible evidence on the record that BoatUS and SAMS had either an express or tacit agreement to do a wrongful act.   Briggs cites to two specific facts to support his contention that a civil conspiracy existed:   (1) that after Spahr submitted his formal complaint, he told Lobley in an email to keep him "updated so we can put this one to bed;" and (2) that after SAMS terminated Briggs's accreditation, Spahr "rewarded" Lobley with ten survey assignments.   D. 89 at 18-19 (citing D. 91 ¶¶ 41-42).   First, as to the email, Lobley wrote to Spahr on May 16, 2012: "Hi Bruce, How's the signed letter coming.   The gentleman has been suspended and he is to appeal in June at our next BOD meeting.   Without the signed letter, I will be in hot water."   D. 89-8 at 2.   Spahr responded:   "Joe, I sent a second letter out today.   Please keep me updated so we can put this one to bed."   Id.   While Briggs asserts that this email exchange is "strong evidence" that Spahr and Lobley were "working toward the same unlawful goal," even if this evidence may bear upon the existence of an agreement, it does not suggest an agreement to commit a wrongful act.   Short of Briggs's speculation, there is no indication from these emails that Spahr and Lobley were working toward any goal except for securing a signed letter from Spahr for Briggs's appeal.   Briggs has directed the Court to no specific, admissible facts showing that BoatUS influenced SAMS's decision to terminate his accreditation.

Second, the fact that Lobley was offered ten survey assignments after Briggs's termination does not save this claim.   Lobley testified that before Briggs's suspension, he already

had a business relationship with BoatUS and that BoatUS had ordered surveys from him in the past. D. 89-3 at 8. Without more, the Court concludes that it would not be reasonable to infer that Lobley's performing two surveys for BoatUS after Briggs's SAMS termination, id., equates to evidence of an agreement to commit a wrongful act. See Ward v. Costello, No. 984871J, 2002 WL 31973253, at *6 (Mass. Super. Dec. 17, 2002) (noting that "conclusory reasoning" cannot be used to substantiate a claim that the Defendants had a common plan); Finlay v. Fischbach & Moore, Inc., No. 971208F, 1998 WL 1181689, at *6 (Mass. Super. Aug. 28, 1998) (concluding that a person's mere "knowledge of the situation" does not make a civil conspiracy claim tenable). Therefore, the Court ALLOWS BoatUS's motion to dismiss the civil conspiracy claim.

**B.      The Court Allows in Part SAMS Motion for Summary Judgment, But Only as to the Intentional Interference with Prospective Business Relations and Civil Conspiracy Claims**

*1.      Due Process*

SAMS first asserts that it is entitled to summary judgment on the claim for violation of Briggs's due process rights. D. 74 at 6. SAMS is a not-for-profit corporation incorporated in Florida. D. 73 ¶ 6. "It is a well established proposition in Florida law that ordinarily courts will not intervene in the internal affairs of . . . voluntary associations." Rewolinski v. Fisher, 444 So. 2d 54, 58 (Fla. Dist. Ct. App. 1984) (citation omitted). However, limited exceptions exist. Id. For instance, "a private organization . . . may not expel or discipline a member adversely affecting substantial property, contract or other economic rights, except as a result of fair proceedings which may be provided for in organization by-laws, carried forward in an atmosphere of good faith and fair play." McCune v. Wilson, 237 So. 2d 169, 173 (1970). Courts intervene only "to ensure that a fair proceeding is held." Horner v. Homestead S. Dade Bd. of Realtors, Inc., 405 So. 2d 492, 494 (Fla. Dist. Ct. App. 1981). Thus, in assessing whether SAMS

violated Briggs's due process rights, the Court should consider whether "(1) the association's action adversely affects substantial property, contract or other economic rights and the association's own internal procedures were inadequate or unfair, or if (2) the association acted maliciously or in bad faith." Rewolinski, 444 So. 2d at 58 (citation and quotations omitted).

i.      Briggs's Economic Rights

SAMS argues that Briggs's accreditation termination did not substantially affect any property, contract or other economic right. D. 74 at 7. However, disciplinary action by a professional organization may warrant due process protection:

> Professional organizations, although voluntary in nature, often attain a quasi-public significance. In public view, membership in such organizations may appear to be a tangible demonstration of professional competence and skill, professional responsibility, and acceptance by one's professional peers. The fact that an individual member expelled from membership may not be prohibited from practicing his chosen occupation or profession is not a sufficient test to determine whether he needs and is entitled to judicial protection from unfair proceedings or arbitrary actions. When a voluntary association achieves this quasi-public status, due process considerations come into play. . . .

> Disciplinary action against a member of a professional organization, although falling short of expulsion from occupation, may have an import which transcends the organization itself because it conveys to the community that the disciplined member was found lacking by his peers. For this reason, it is suitable and proper that an organization, whether a domestic or foreign nonprofit corporation, or a nonchartered nonprofit association, be held to reasonable standards of due process and fairness, especially those inherent in its own by-laws, rules or customs.

McCune, 237 So.2d at 172. Here, considering the facts in the light most favorable to Briggs, a factual issue remains as to whether the termination of his SAMS accreditation warranted "reasonable standards of due process and fairness." Id. As the McCune court articulated, while "not all private associations must observe due process standards . . . such standards must be observed when a private association becomes quasi-public, assumes a public purpose of its own, incorporates and seeks the tax shelters and other protections of public law, or otherwise assumes

a larger purpose or statute than pleasant, friendly and congenial social relationships." Id. Here, SAMS does not dispute, at least for purposes of this summary judgment motion, that it "is intended to be an organization of professional marine surveyors who have come together to promote the good image and general well being of their chosen profession that also offers accreditation and training to members." D. 73 ¶ 7 (citing Lobley Aff., D. 76 ¶ 2; SAC, D. 54 ¶ 19). SAMS's objectives include providing "an organization complementary to the marine industry," suggesting "standards for technical procedures for all members" and educating the public. D. 73 ¶ 8 (citing D. 76 ¶ 3). Given these facts, the Court cannot say that SAMS is merely a social organization as opposed to a "quasi-public" one, such that it need not afford members due process prior to terminating them.

ii.     Fair and Adequate Procedure

Briggs argues that SAMS had unfair rules, namely, that attorneys were not permitted at the hearing, the hearing was not recorded and live witnesses were not required. D. 86 at 15. Briggs has directed the Court to no authority suggesting that due process standard applicable here requires that he be allowed to have an attorney at a hearing for suspension from a non-mandatory professional accrediting body or that the hearing be recorded. See, e.g., Robinson v. Bd. of Pub. Instruction of Dade Cnty., 271 So. 2d 784, 787 (Fla. Dist. Ct. App. 1973) (concluding that in a school suspension hearing, due process did not entitle the student to an attorney and that to "impose such requirements from the criminal law upon a hearing before a school principal would be unrealistic and illogical"). Further, while live witnesses were not required at the hearing, they were permitted. Lobley Aff. (D. 76 ¶ 37). Therefore, there is no genuine issue of material fact as to whether SAMS's procedures and policies were fair and adequate.

Still, however, the Court cannot allow summary judgment as to this claim because there is a genuine issue of fact as to whether SAMS violated its own policies.  See D. 86 at 15. According to SAMS's written suspension policy, a SAMS "member may be subject to suspension of membership for . . . a formal written complaint of violation of SAMS® Code of Ethics and Rules of Practice, filed with the International Office, investigated as prescribed in the 'Termination Policy' and affirmed by a two-thirds (2/3) vote of the Board of Directors . . . ."  D. 76-3 at 1.  But, if as here, the matter "is deemed to be of a very serious nature," the President may "recommend" a temporary immediate suspension of a member to the Executive Committee. Id.   The "Executive Committee may, by unanimous vote, direct a temporary immediate suspension of the member pending a report by the Investigation Committee and subsequent review by the Board of Directors."  Id.   The suspension policy allows that the "investigative procedure described in the 'Termination Policy' shall apply to the investigation requirement under this 'Suspension Policy.'"  Id.

SAMS's policies and procedures then allow a member to be subject to "termination of membership [when there is] a formal written complaint of violation of SAMS® Code of Ethics and Rules of Practice, filed with the International Office."  D. 76-4 at 1.  The procedures allow that after a formal written complaint is filed with supporting documentation, the SAMS president may "direct the Ethics Committee Chairman (Executive VP) to appoint an Investigation Committee of two (2) AMS® [sic] members to conduct an investigation of the complaint."  Id. Thereafter, the Investigation Committee "shall have thirty (30) days to review information, conduct an investigation, and make recommendations to the Ethics Committee Chairman and the President."  Id.   The President is to "inform the Accused Member of the Committee's recommendation" and the member must be provided a copy of the committee's reports.  Id.

As described above, the termination procedure requires that an accused member is to receive a copy of the Investigative Committee's reports. Briggs has presented admissible evidence by way of his affidavit that he was not provided any of the investigation committee's findings, either orally or in writing. D. 88 ¶ 84. SAMS does not dispute this fact with any admissible evidence. See D. 94 at 17, ¶ 36. A factfinder could conclude that this purported break in the stated policies and procedures constituted an unfair proceeding, particularly given Briggs's assertion that he was "not even told of the factual basis for the complaint against him." D. 88 ¶ 84. Therefore, the Court DENIES SAMS's motion for summary judgment as to the due process claim, Count 1.

> 2.    *Intentional Interference with Prospective Business Relations and Civil Conspiracy*

SAMS also contends that Briggs's claims for tortious interference and civil conspiracy fail. D. 74 at 12, 17. As discussed above, a tortious interference claim requires a showing that SAMS had knowledge of Briggs's business relationship with a third party and interfered with that relationship by improper motive or means. United Truck, 406 Mass. at 814-15.

SAMS first argues that there is no evidence that it knowingly interfered with any business relationship with a third party. Briggs argues that SAMS "well understood that they would be sabotaging his business relationships with many of his customers in the process" of removing him from SAMS. D. 86 at 17. But to support that assertion, Briggs cites to Lobley's deposition testimony that several large insurance companies "look for" surveyor accreditation, though they do not require it. D. 86-3 at 4. This statement does not make a showing that SAMS knowingly interfered with a third party business relationship.

Further, in regard to the civil conspiracy claim, as discussed above, the Court lacks evidence of an agreement to commit a wrongful act.

Therefore, the Court ALLOWS summary judgment as to the tortious interference claim against SAMS, Count 3, and the civil conspiracy claim against SAMS, Count 5.

###### 3.    *Chapter 93A*

In regard to the Chapter 93A claim, SAMS first argues that Briggs as an individual, as opposed to his surveyor business, was a member of SAMS, and therefore, Chapter 93A, § 9 applies as opposed to Chapter 93A, § 11.  D. 74 at 15.  As discussed above, Section 11 applies to "[a]ny person who engages in the conduct of any trade or commerce [] who suffers any loss of money or property . . . as a result of the use or employment by another person who engages in any trade or commerce . . . ."  Mass. Gen. L. c. 93A, § 11.  Section 9 does not have a "trade or commerce" requirement.  Mass. Gen. L. c. 93A, § 9.  Here, Briggs has presented evidence that his marine surveying business was a sole proprietorship and that his "sole purpose for membership in SAMS was to aid his marine survey business."   D. 87 ¶ 47 (citing Briggs Interrogatory Responses, D. 86-10 at 7; Briggs Dep., D. 86-11 at 11).   The Court cannot conclude on this record that Briggs was not engaged in trade or commerce and denies summary judgment on these grounds.

SAMS also argues that Briggs cannot demonstrate that SAMS engaged in an unfair or deceptive act or practice.  D. 74 at 16-17.  "[A] practice or act will be unfair under [Chapter 93A] if it is [] within the penumbra of a common law, statutory, or other established concept of unfairness . . . ."  Incase Inc. v. Timex Corp., 488 F.3d 46, 57 (1st Cir. 2007) (quoting Morrison v. Toys "R" Us, Inc., 441 Mass. 451 (2004) (quotations omitted)).  Again, as discussed above, there are still disputed factual issues surrounding, among other issues, whether SAMS failed to honor Briggs' due process rights.  If proven, this could constitute a violation of "an established

concept of unfairness." <u>Morrison</u>, 441 Mass at 457 (quoting <u>Heller Fin. v. Insurance Co. of N. Am.</u>, 410 Mass. 400, 408 (1991)).

Therefore, the Court DENIES SAMS's motion for summary judgment as to the c. 93A claim.

**VI.     Conclusion**

For the reasons discussed above, the Court ALLOWS IN PART BoatUS's motion for summary judgment, D. 71, as to the civil conspiracy claim (Count Five) and DENIES IN PART BoatUS's motion as to the remainder of the counts.  The Court ALLOWS IN PART SAMS's motion for summary judgment as to tortious interference (Count Three) and civil conspiracy (Count Five) claims, and DENIES IN PART SAMS's motion as to the remainder of the counts. D. 72.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge